IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| LISA T.,[1] | ) |
|     Plaintiff, | )    Civil Action No. 5:21-cv-00068 |
| | ) |
| v. | )    REPORT & RECOMMENDATION |
| | ) |
| COMMISSIONER OF SOCIAL | )    By:    Joel C. Hoppe |
| SECURITY ADMINISTRATION, | )           United States Magistrate Judge |
|     Defendant. | ) |

Plaintiff Lisa T. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' arguments, and the applicable law, I find that the Commissioner's denial of benefits is not supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1383c(a)(3)(B); *accord* 20 C.F.R. § 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Lisa protectively filed for SSI in August 2018. *See* Administrative Record ("R.") 27, 174–81. She alleged that she became disabled on January 2, 2000, because of back and neck problems, sciatica, fibromyalgia, asthma, lung disorder, thyroid disorder, high blood pressure, high cholesterol, and rheumatoid arthritis. *See* R. 213–14. Lisa was fifty-one years old, or a "person closely approaching advanced age" under the regulations, 20 C.F.R. § 416.963(d), when she filed her SSI claim.[3] *See* R. 37. Disability Determination Services ("DDS"), the state agency, denied that claim initially in November 2019, R. 82, and upon reconsideration in April 2020, R. 98. That November, Lisa appeared with counsel and testified at an administrative hearing before ALJ Scott Massengill. R. 46–78. A vocational expert ("VE") also testified. R. 70–76.

ALJ Massengill issued an unfavorable decision on February 10, 2021. R. 27–39. He found that Lisa had the following severe medically determinable impairments ("MDI") during the relevant time: fibromyalgia, inflammatory arthritis, asthma, and anxiety. R. 30. Her asthma

---

[3] Lisa's alleged disability onset date (January 2, 2000) is not relevant to this decision because SSI benefits cannot be paid for any period before the month in which the claimant filed her SSI claim. The earliest date on which Lisa could establish "disability" for SSI purposes is August 27, 2018, the date she protectively filed that application. *See* R. 54–55, 174; 20 C.F.R. §§ 416.202, 416.501.

3

and anxiety did not meet or medically equal the Listings corresponding to those MDIs. *See* R. 30–32 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.03 (asthma), 12.06 (anxiety)). ALJ Massengill did not mention Lisa's severe inflammatory arthritis, *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 14.00(D)(6), 14.09(A)–(D)), or severe fibromyalgia ("FM") in his Listings analysis, *see* SSR 12-2p, 2012 WL 3104869, at *6 (July 15, 2012) (instructing ALJs to "determine whether FM medically equals a listing (for example [§] 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment"). *See* R. 30–32.

ALJ Massengill then evaluated Lisa's residual functional capacity ("RFC") based on all her MDIs. *See* R. 32–37. He found that Lisa could perform "light work . . . except she is able to stand/walk up to four hours and sit up to six hours in an 8-hour workday" and she could "adjust position every 45 minutes while remaining at or near the workstation or work area."[4] R. 32. Additionally,

> she can occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl. She is limited to frequent use of either upper extremity for fine fingering or grasping/handling of small objects (such as smaller than a golf ball). [She] would need to avoid concentrated exposure to extreme cold, heat or humid conditions, fumes, odors, dusts, gases or other pulmonary irritants. [She] would need to avoid work at unprotected heights. She would be able to understand and remember simple, routine instructions and carry out repetitive tasks. She would be able to make simple[] work-related decisions.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). "The full range of light work requires the ability to stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)). An RFC that allows the claimant to lift twenty pounds at one time, but restricts total standing and walking to fewer than six hours during an eight-hour workday, *see* R. 32, is often characterized as permitting a "reduced" or "limited" range of light work because the person's capacities for standing/walking fall between what is needed to do "sedentary" work and what is needed to perform the "full range of light work." *E.g.*, *Neal*, 2010 WL 1759582, at *2 (explaining that a four-hour standing/walking restriction "exceed[s] the definition of sedentary work" because it permits the claimant to "stand or walk for more than two hours per workday," but "fall[s] short of the full range of light work because [the claimant] cannot stand or walk for six hours per workday").

4

> She is able to deal with occasional changes in a routine work setting. She is able to have occasional interaction with co-workers and is able to have superficial or incidental interaction with the general public.

R. 32–33 (capitalization altered). Based on his RFC finding and the VE's testimony, ALJ Massengill found that Lisa could perform certain light, unskilled occupations (small-products assembler, routing clerk, battery assembler) that offered a significant number of jobs in the national economy. R. 38 (citing R. 72–76). Thus, ALJ Massengill concluded that Lisa was not disabled from August 27, 2018, through February 10, 2021. R. 38–39. The Appeals Council declined to review that decision, R. 13–15, and this appeal followed.

## III. Discussion

On appeal, Lisa primarily challenges ALJ Massengill's evaluation of a medical opinion from her treating rheumatologist, Sepher Mesdaghinia, M.D., in determining the extent to which Lisa's severe fibromyalgia impacted her physical RFC. *See generally* Pl.'s Br. 10–15 (citing R. 37, 2583–84), ECF No. 15. She argues that ALJ Massengill relied on one piece of irrelevant evidence to support his conclusion that Dr. Mesdaghinia's opinion had "little persuasive value," R. 37 (citing R. 2555), and overlooked relevant medical evidence tending to support the significant functional limitations that Dr. Mesdaghinia identified in his opinion. *See* Pl.'s Br. 12–15. Lisa's objection is persuasive.

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and

5

mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

"Medical opinions"—i.e., statements from a medical source about what the claimant "can still do despite" her MDIs and whether she has "impairment-related limitations or restrictions" meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 416.913(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Woods v. Berryhill*, 886 F.3d 686, 695 (4th Cir. 2018). For SSI claims filed after March 27, 2017, ALJs must "articulate in [the] . . . decision how persuasive [they] find all of the medical opinions" in the claimant's record to be, 20 C.F.R. § 416.920c(b), using the relevant factors listed in the regulations, "as appropriate," *id.* § 416.920c(a). "[S]upportability and consistency are the most important factors [ALJs] consider when [they] determine how persuasive [they find] a medical source's medical opinion . . . to be." *Id.* § 416.920c(b)(2) (cleaned up). ALJs therefore "will explain how [they] considered" those two factors when evaluating a medical source's medical opinion. *Id.*

"Supportability" looks at the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion(s)[.]" *See id.* § 416.920c(c)(1). The "more relevant" the evidence and explanations "presented by a medical source are to support his or her medical opinion(s), the more persuasive" those opinions will be. *Id.* "Consistency," on the other hand, compares the medical opinion to other relevant evidence in the claimant's record. *See id.* § 416.920c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* ALJs "may, but [generally] are not required to, explain how [they] considered" other regulatory factors, *id.*, such as the source's medical

6

specialty, familiarity with the record, or treating relationship with the claimant. *See id.* § 416.920c(b)(3).

This regulation is more flexible than its prior version, which accorded special deference to medical opinions from the claimant's "treating" physician, psychologist, or other acceptable medical source. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)); *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c) (2016)); 20 C.F.R. § 416.920c(a) (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources."). Even under these new regulations, an ALJ "cannot reject an examining or treating [source's] opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence," *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). Fundamental principles of judicial review also still apply. *See, e.g.*, *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) ("[E]ven under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)).

In May 2019, Lisa established care with Dr. Mesdaghinia to "discuss evaluation and management of possible Rheumatoid Arthritis." R. 2536. She complained of morning stiffness and "pain and swelling in her hands, knees, and feet." *Id.* Tylenol did not help. *Id.* Lisa's musculoskeletal exam revealed "soft tissue tenderness all over" and tenderness in "m[a]ny small joints" without swelling on both hands, but full range of motion, normal-appearing axial joints, and no swelling or tenderness in the lower extremities. R. 2538. Dr. Mesdaghinia noted that Lisa endorsed or exhibited "distribution of pain, fatigue, poor sleep, labile mood, exercise intolerance

7

and tender soft tissue trigger points compatible with fibromyalgia." R. 2539. He sent Lisa for X-rays and blood work to rule out rheumatoid arthritis. Both were normal. *See* R. 2542.

Lisa saw Dr. Mesdaghinia again in June 2019, June 2020, and October 2020. *See generally* R. 2542–58 (Ex. 11F). His exam findings show that Lisa consistently endorsed "several tender soft tissue spots" and tenderness in "many small joints" on both hands, but also had full range of motion, normal-appearing axial joints, no swelling in the hands, and no swelling or tenderness in the lower extremities. R. 2544 (June 2019); R. 2549 (June 2020); R. 2555 (Oct. 2020). Lisa reported "ha[ving] significant muscle cramps frequently" in June 2019, R. 2542, "continued . . . pain and muscle spasms" in June 2020, R. 2547, and "severe fatigue [and] pain" in October 2020, R. 2553. Chronic "pain and fatigue" affected her functioning "very much." R. 2547 (June 2020).

In June 2019, Dr. Mesdaghinia diagnosed Lisa with fibromyalgia, noting that she "had longstanding pain, fatigue, stiffness throughout the day, [with] normal labs and normal xrays," and failure to respond to anti-inflammatory treatment. R. 2545 ("This makes a compelling case for a chronic pain syndrome such as fibromyalgia."). Lisa's "only viable option" at that point was to establish care with a pain management clinic. *Id.* That October, Lisa told another provider that she "ach[ed] all over with extra pain in the l[eft] chest and l[eft] shoulder." R. 1687. She could not go to "pain management due to her insurance coverage." *Id.*

Jack Hutcheson, M.D., reviewed Lisa's medical records for DDS in November 2019. He opined that she could lift/carry and push/pull twenty pounds occasionally and ten pounds frequently; sit and stand and/or walk for about six hours each during a normal eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to temperature extremes, respiratory irritants, and hazards. R. 94–95. He

8

attributed these limitations to Lisa's fibromyalgia, asthma, osteoarthrosis of the bilateral thumbs, inflammatory arthritis, and sciatica. *Id.* He did not identify any manipulative limitations. *See id.* Richard Surrusco, M.D., affirmed this RFC assessment after reviewing Lisa's records in April 2020. R. 109–11.

In June 2020, Lisa told Dr. Mesdaghinia she had "not been able to see a pain specialist because of the current [COVID-19] pandemic." R. 2547. During the same visit, Dr. Mesdaghinia noted in his assessment that Lisa could "not walk or move without pain and prolonged standing or sitting also cause[d] pain." R. 2550. Her pain, "likely due to fibromyalgia," was "substantial and debilitating." *Id.* Lisa had not been able to tolerate FDA-approved fibromyalgia medications, and she could not get in a pool for low-impact water exercises. Pain management was still "the only viable option" for her. *Id.* Lisa tried to establish care with a pain specialist before her next visit with Dr. Mesdaghinia, but she was not able to do so "because of insurance limitation[s]." R. 2553. That October, Dr. Mesdaghinia noted in his assessment that Lisa was "suffering from this significantly, so [he] reasonably agreed to assist with [her] going on disability due to severe limitation in function and exacerbation of her symptoms with activity." R. 2556.

Dr. Mesdaghinia completed a physical assessment form for Lisa in November 2020. R. 2561–62. He opined that her fibromyalgia symptoms would "constantly" be severe enough to interfere with the attention and concentration necessary to perform simple work-related tasks and she would "frequently" need to take unscheduled breaks (of "unknown" length) during an eight-hour workday. R. 2561. Lisa would be absent from work "more than four times a month" because of her fibromyalgia symptoms. *See* R. 2562. She could walk zero city blocks without rest or significant pain. R. 2561. Dr. Mesdaghinia opined that Lisa was "inconsistently able to sit, or stand or walk," but he did not indicate the "total number of hours" she could sit and

9

stand/walk in an eight-hour workday. *Id.* She could never lift/carry any amount of weight or use either hand for fine or gross manipulation. *Id.* The form did not ask Dr. Mesdaghinia to explain or otherwise support his proposed limitations. *See* R. 2561 ("If available, attach all relevant treatment notes, laboratory, and test results.").

ALJ Massengill summarized portions of Dr. Mesdaghinia's treatment notes in his decision, including Dr. Mesdaghinia's normal physical exam findings and contemporaneous opinions that Lisa endorsed "distribution of pain, fatigue, . . . and tender soft tissue trigger points" despite having normal bloodwork and X-rays and that her fibromyalgia was "very limiting in function" and caused "significant pain" with "prolonged standing or sitting." R. 34 (citing R. 2536–39, 2542, 2545, 2547–50). He did not mention Dr. Mesdaghinia's findings that Lisa endorsed both "several tender soft tissue spots" and tenderness in "many small joints" on both hands at each rheumatology visit. R. 2538, 2544, 2549, 2555. ALJ Massengill found Dr. Mesdaghinia's opinion had "little persuasive value, despite being from a treating" rheumatologist, R. 37; *see* R. 34, because it was "an incomplete assessment offering no explanation or support for the limitations/restrictions" on Lisa's work-related functioning, R. 37. He also found it "somewhat inconsistent with Dr. Mesdaghinia['s] own records in Exhibit 11F, indicating that [Lisa] ha[d] a full range of motion as recently as October 22, 2020." R. 37 (citing R. 2529–58).

Although ALJ Massengill summarized Dr. Mesdaghinia's treatment records earlier in his decision, he did not consider whether the abnormal findings on exams and contemporaneous observations documented in those records offered "explanation or support" for Dr. Mesdaghinia's assessment. Read together, Dr. Mesdaghinia's notes clearly convey he thought Lisa's chronic fibromyalgia pain and fatigue were physically debilitating. Additionally, while Dr.

10

Mesdaghinia arguably offered an "incomplete assessment" of Lisa's ability to sit and stand/walk for a certain amount of time during an eight-hour workday, he provided specific opinions about her inability to lift/carry any amount of weight and to use her hands for fine or gross manipulation. Those opinions were not inconsistent with Dr. Mesdaghinia's findings that Lisa endorsed "several tender soft tissue spots" and tenderness in "many small joints" on both hands at each rheumatology visit. *See* R. 2538, 2544, 2549, 2555. ALJ Massengill also acknowledged Dr. Mesdaghinia's earlier comments that Lisa "could not walk or move without pain" and that "prolonged standing or sitting . . . caused significant pain," R. 34, but he did not explain how he weighed that evidence when evaluating Dr. Mesdaghinia's medical opinion. Nor did he explain why Dr. Mesdaghinia's work-preclusive opinion was "somewhat inconsistent" with his treatment notes indicating that Lisa's fibromyalgia pain was "substantial and debilitating," R. 2547 (June 2020), even though she consistently had full range of motion on exams, R. 2538, 2544, 2549, 2555, whereas the DDS physicians' less-restrictive RFC assessments were "consistent with" with those *same* treatment notes showing that Lisa "experience[d] significant pain and muscle spasms associated with fibromyalgia," R. 36 (citing R. 2547–50 (June 2020)). ALJ Massengill's RFC finding includes significantly more restrictions than the DDS physicians identified—including only four hours standing/walking, a sit/stand option, and bilateral manipulative limitations—but he did not adequately explain how he chose those restrictions.[5] *See Arakas*, 983 F.3d at 95

---

[5] As part of his RFC assessment, ALJ Massengill found that Lisa's MDIs could reasonably be expected to cause her alleged symptoms, R. 35, including "swelling in her hands and feet," R. 33, and "significant pain and muscle spasms associated with fibromyalgia and inflammatory arthritis." R. 36. Her statements describing the work-preclusive intensity, persistence, and limiting effects of these those symptoms, however, were "inconsistent with" three categories of evidence (i) unidentified "findings on examination[s] and diagnostic testing," R. 35; (ii) treatment notes showing Lisa "received conservative treatment for her conditions," including being "prescribed medication for her fibromyalgia," and being referred "to pain management for her symptoms," but "repeatedly" not following through with those "recommendations . . . due to

11

("[W]e do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)).

ALJ Massengill's singular focus on Lisa having "full range of motion as recently as October 22, 2020," R. 37, also indicates that his evaluation of Dr. Mesdaghinia's medical opinion was "based on an incorrect legal standard as well as a critical misunderstanding of fibromyalgia," *Arakas*, 983 F.3d at 98. In *Arakas*, the Fourth Circuit held that "ALJs may not rely on objective medical evidence (or lack thereof)—even as just one of multiple factors—to discount" subjective statements, or medical opinions, "regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." 983 F.3d at 97; *see id.* at 108–09 (extending this rule to medical opinions describing a fibromyalgia patient's impairment, symptoms, or resulting limitations). This is because "[o]bjective indicators such as normal clinical [examinations] and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease." *Id.* at 97. "[P]hysical examinations of patients with fibromyalgia will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003) (cleaned up)). Thus, ALJ Massengill could not rely on Lisa's

---

issues with insurance or costs," *id.* (citing R. 2547–50, 2556 (Ex. 11F)); and (iii) evidence that she "engaged in significant activities of daily living" like "manag[ing] her personal care," making "simple meals in the microwave," doing laundry, and going grocery shopping, R. 35–36 (citing R. 221–28 (Ex. 3E)). ALJ Massengill concluded that Lisa's "ability to complete most of her activities of daily living independent[ly] support[ed] a finding that she ha[d] the capacity to work," R. 36, notwithstanding other "evidence showing that [she] experiences significant pain and muscle spasms associated with fibromyalgia and inflammatory arthritis," *id.* (citing R. 2547–50). The Fourth Circuit has warned against equating a person's ability to do limited basic daily activities with their ability to work full time in a competitive workplace. *See Arakas*, 983 F.3d at 100–01.

12

normal range of motion to discount Dr. Mesdaghinia's opinion of her debilitating fibromyalgia. *See id.* at 97, 106. Moreover, ALJ Massengill overlooked "ample evidence of consistent trigger-point findings," *id.*, joint tenderness, and/or diffuse body pain, *see, e.g.*, R. 1337, 1690, 1849, 2484, 2514, 2516, 2538–39, 2544, 2549, 2555, which are the only objective abnormalities associated with fibromyalgia, *see Arakas*, 983 F.3d at 97. This was error. Accordingly, I find that the ALJ's assessment of Dr. Mesdaghinia's medical opinion and, as a result, the ALJ's RFC determination are not supported by substantial evidence

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 16; **REVERSE** the Commissioner's final decision denying Lisa's SSI claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 9, 2023

Joel C. Hoppe
United States Magistrate Judge